UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| ARMSTRONG WORLD INDUSTRIES, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 02-4360 |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) | Jury Trial Demanded |
| Defendant. | ) ) ) | |

## COUNTERCLAIMS AND JURY DEMAND
## OF LIBERTY MUTUAL INSURANCE COMPANY

Liberty Mutual Insurance Company ("Liberty Mutual") for its Counterclaims to the First

Amended Complaint for Declaratory Judgment of Armstrong World Industries, Inc.

("Armstrong") states as follows:

### Introduction

1.    By these counterclaims for declaratory judgment, Liberty Mutual seeks a

declaration regarding the extent to which certain general liability insurance policies issued by

Liberty Mutual to Armstrong for the years 1977 through 1981 provide coverage for asbestos

bodily injury claims asserted by third persons against Armstrong.

### The Parties

2.    Plaintiff-in-counterclaim Liberty Mutual is a corporation duly organized and

existing under the laws of the Commonwealth of Massachusetts with its principal place of

business in Boston, Massachusetts.

1

3.      Defendant-in-counterclaim Armstrong is a corporation duly organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Lancaster, Pennsylvania.

## Background

4.      Since the early 1900s, Armstrong has manufactured and sold commercial building products, including insulation, flooring, and gaskets, some of which contained asbestos. Commencing in the 1970s, Armstrong began to incur significant liability for asbestos bodily injury claims by those who claimed injury from Armstrong's asbestos products.

5.      Liberty Mutual issued general liability insurance policies to Armstrong covering the years 1973 through 1981. In the 1970s and early 1980s, Armstrong sought, and Liberty Mutual provided, coverage under certain of those policies for asbestos bodily injury claims against Armstrong.

6.      In June 1985, in an effort to deal with the nationwide wave of asbestos bodily injury claims, a number of asbestos producers, including Armstrong, and insurance companies, including Liberty Mutual, signed the "Agreement Concerning Asbestos-Related Claims," which is often referred to as the "Wellington Agreement." Thereafter, and pursuant to the provisions of the Wellington Agreement, asbestos bodily injury claims against Armstrong were handled by the Asbestos Claims Facility and the entity that replaced it, the Center for Claims Resolution, and were paid by insurance policies in Armstrong's Wellington "coverage block," which included the Liberty Mutual policies for the years 1973 through 1976.

7.      By letter dated July 13, 2000, Armstrong notified Liberty Mutual that, upon exhaustion of all insurance coverage in its Wellington "coverage block," Armstrong would be

seeking coverage for its asbestos bodily injury claims "for amounts allocable to the non-products classification" under a subsequent Liberty Mutual policy, which covers the year 1977. This policy, and the four additional policies that Liberty Mutual issued to Armstrong for the years 1978 through 1981, are referred to hereafter as the "Policies."

8.      A number of disputes exist between Liberty Mutual and Armstrong about the extent of coverage available under the Policies for asbestos bodily injury claims against Armstrong, and Liberty Mutual hereby seeks a declaration by the Court to resolve those disputes.

**Count I:  For A Declaration That Claims Arising From
Installation Operations Completed Before
The Period Of The Policies Are "Completed Operations" Claims**

9.      Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

10.      Each of the Policies contains an aggregate limit of liability for Liberty Mutual of $1 million for so-called "products" claims that fall within either (i) the "completed operations hazard" or (ii) the "products hazard" of the Policies.  The Policies define the "completed operations hazard" to include claims involving "bodily injury" (defined as "bodily injury . . . which occurs during the policy period") arising from operations by Armstrong "where the 'bodily injury' occurs after such operations have been completed" by Armstrong.  The Policies define the "products hazard" to include claims involving "bodily injury" (again, defined as "bodily injury . . . which occurs during the policy period") arising from Armstrong's products "where the 'bodily injury' occurs after physical possession of such products has been relinquished" by Armstrong to others.

3

11.    The parties customarily have used the term "non-products" claims to describe bodily injury claims that do not fall within the "completed operations hazard" or the "products hazard" of the Policies.  The Policies contain per occurrence limits, but not aggregate limits of liability for non-products claims.

12.    Armstrong now asserts that many of the asbestos bodily injury claims against it are non-products claims (which have no aggregate limits of liability) under the Policies because the claims allegedly arise from the claimants' exposures to asbestos fibers that Armstrong released while it conducted contracting operations installing asbestos insulation, even though the claimants' bodily injuries arising during the period of the Policies occurred long after those operations were completed.

13.    When an asbestos bodily injury claim (i) arises from exposure of the claimant to asbestos fibers released while Armstrong was engaged in installing asbestos insulation and (ii) Armstrong had completed the installation work before the Policies were issued, that claim falls within the plain language of the Policies' "completed operations hazard" and, therefore, the Policies' aggregate limits for products claims apply.  That is because the Policies focus, for purpose of the classification of claims, on whether the "bodily injury . . . during the policy period" occurred before or after the insured's operations were completed, and provide that, where such injury, during the policy period, occurred "after such operations have been completed," the claim must be classified as a products claim within the "completed operations hazard."  Because Armstrong ceased installing asbestos products in 1957, long before Liberty Mutual issued any of the Policies, claims based on exposures to Armstrong installation operations necessarily fall within the "completed operations hazard" of the Policies, and such claims cannot be classified as non-products claims under the Policies.  The same is true of any

4

claims against Armstrong based upon operations of its installation subsidiary, which Armstrong formed effective 1958 and sold in 1969.

14.    Armstrong disputes this conclusion and contends instead that every asbestos bodily injury claim that arises from an installation operation of Armstrong or its installation subsidiary should be classified as a non-products claim, even though all of these asbestos installation operations were completed years before any of the Policies were issued.  This dispute constitutes an actual and justiciable controversy between the parties.

15.    WHEREFORE, on Count I, Liberty Mutual demands judgment declaring that: Any asbestos bodily injury claim against Armstrong that arises from exposure of the claimant to asbestos fibers released during an asbestos installation operation of Armstrong or its installation subsidiary must be classified as a products claim under the "completed operations hazard," because all of these installation operations were completed years before any of the Policies were issued.

### Count II:  For A Declaration That The Statute of Limitations Bars Suit By Armstrong For Non-Products Coverage Under The Policies

16.    Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

17.    In the mid-1970s, Armstrong began to submit to Liberty Mutual claims for bodily injury arising from exposure to asbestos, seeking coverage for those claims under insurance policies issued by Liberty Mutual to Armstrong.

18.     Liberty Mutual consistently classified and paid these claims under the "products" coverage in the Liberty Mutual policies.    Liberty Mutual contemporaneously informed Armstrong that the claims would be classified as products claims, and Armstrong acquiesced in that classification.

19.     In 1984, as Armstrong's products coverage was being exhausted, Armstrong asserted for the first time that "non-products" coverage existed for these claims:  in Armstrong's words, "the light bulb went on" for Armstrong regarding the possibility of non-products coverage for its claims.  Liberty Mutual continued to treat all of Armstrong's claims as products claims.

20.     In 1985, Armstrong moved to amend pending insurance coverage litigation against Liberty Mutual to add a claim seeking non-products coverage for the asbestos bodily injury claims against Armstrong.  Liberty Mutual opposed this motion, and it was denied by the court without prejudice because the pending litigation was already too complex.

21.     In 1986, Liberty Mutual ceased all payments to Armstrong for asbestos bodily injury claims on the grounds that the products coverage under the pertinent policies was exhausted.

22.     In 1987, the Asbestos Claims Facility (the predecessor of the Center for Claims Resolution) informed its members, including Armstrong, that the Facility had been unable to resolve issues regarding the classification for insurance purposes of asbestos bodily injury claims as non-products versus products claims.

23.    In 1996, Armstrong initiated an arbitration, seeking non-products coverage for its asbestos bodily injury claims under policies issued by Liberty Mutual for 1973-1976.  In 2003, an Appellate Arbitration Award was issued in Liberty Mutual's favor on grounds that Armstrong's claim was barred by the statute of limitations.

24.    In the present case, which was filed in 2002 -- 17 years after Armstrong first sought to assert its claim for non-products coverage in court in 1985 -- Armstrong now seeks declarations regarding non-products coverage under policies issued by Liberty Mutual for 1977-1981.

25.    Any suit by Armstrong seeking non-products coverage under the 1977-1981 Liberty Mutual policies for asbestos bodily injury claims against Armstrong is barred by the statute of limitations.

26.    Armstrong disputes this conclusion and contends instead that the statute of limitations does not bar suit by Armstrong to obtain non-products coverage for asbestos bodily injury claims under the 1977-1981 Liberty Mutual policies.  This dispute constitutes an actual and justiciable controversy between the parties.

27.    WHEREFORE, on Court II, Liberty Mutual demands judgment that:  Any suit by Armstrong for non-products coverage under the 1977-1981 Liberty Mutual policies is barred by the statute of limitations.

### Count III:  For A Declaration That All Asbestos Bodily Injury Claims Constitute A Single Occurrence Under The Policies

28.    Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

29.    Each of the Policies provides that Liberty Mutual will pay for certain damages arising from bodily injury "caused by an occurrence." The Policies define "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."

30.    The asbestos bodily injury claims against Armstrong all arise from a single, uninterrupted, and continuing cause, namely, Armstrong's continuous involvement with asbestos products to which the subject claimants were exposed.

31.    All of the asbestos bodily injury claims against Armstrong constitute a single, unified occurrence under the Policies, which is subject to the single occurrence limit of liability contained in the Policies.

32.    Armstrong disputes this conclusion and contends instead that each asbestos bodily injury claim constitutes a separate occurrence under the Policies, for each of which the single occurrence limit of liability is available. This dispute constitutes an actual and justiciable controversy between the parties.

33.    WHEREFORE, on Count III, Liberty Mutual demands judgment declaring that: All of the asbestos bodily injury claims against Armstrong constitute a single occurrence under the Policies, which is subject to the single occurrence limit of liability contained in the Policies.

**Count IV:  For A Declaration That The "Asbestos Deductible Endorsement" In The Policies Must Be Reformed To Apply To All Asbestos Bodily Injury Claims Or, Alternatively, That The Policies Must Be Rescinded**

34.    Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

35.    Liberty Mutual issued its first insurance policy to Armstrong in 1973.  By the end of 1976, Armstrong was facing an increasing volume of asbestos bodily injury claims.  Such claims had ceased to be a risk and instead had become a certainty.  Liberty Mutual concluded that such claims were uninsurable, except under narrowly-confined limitations.

36.    Thus, Liberty Mutual proposed, and Armstrong agreed, that beginning with the 1977 year, Liberty Mutual would only insure Armstrong's asbestos bodily injury claims subject to a $50,000 per person deductible and a $1 million aggregate limit, both of which will be referred to collectively as the "asbestos deductible endorsement."  Because the vast majority of asbestos bodily injury claims had been for dollar amounts substantially below $50,000, this arrangement meant that Liberty Mutual was providing coverage only for aberrational, catastrophic claims that individually exceeded $50,000 and then only up to the $1 million aggregate limit.  The deductible amount remained $50,000 for the years from 1977 through 1980, and was increased to $100,000 for the last year, 1981.

37.    Liberty Mutual and Armstrong each understood and intended that the asbestos deductible endorsement would apply to all asbestos bodily injury claims against Armstrong.

38.    When the language of the asbestos deductible endorsement was drafted, however, it was written in terms of asbestos products claims, as opposed to all asbestos bodily injury claims.  This occurred because, at the time of drafting, both Liberty Mutual and Armstrong believed (incorrectly, if Armstrong's current position is accepted) that all of the asbestos bodily injury claims asserted against Armstrong were products claims.  Thus, by writing the asbestos deductible endorsement in terms of products claims, the parties thought that all asbestos bodily injury claims would be subject to that endorsement.

9

39.    From 1973, when the first Liberty Mutual policy was issued to Armstrong, through the early 1980s, Armstrong and Liberty Mutual believed and understood that the asbestos bodily injury claims asserted against Armstrong were products claims. In 1984, three years after the last of the Policies was issued, Armstrong abruptly changed its view on the classification of its asbestos bodily injury claims. Armstrong asserts that "the light bulb went on" in 1984 and that it then came to believe that non-products coverage should be available for certain of its asbestos bodily injury claims on the theory that they arose from its asbestos installation activities. In 1985, it asserted that approximately 7% of the asbestos bodily injury claims against it were non-products claims. Beginning in 1996, Armstrong asserted for the first time that the vast majority of the claims against it were non-products claims. If Armstrong's position (which is denied by Liberty Mutual) were to be adopted by this Court, a substantial portion of the pending and future asbestos bodily injury claims against Armstrong to the extent otherwise covered by the Policies would be classified as non-products claims. According to Armstrong, therefore, such claims would fall outside the language of the asbestos deductible endorsement.

40.    Liberty Mutual is entitled to reformation of the language of the asbestos deductible endorsement so that it applies to all asbestos bodily injury claims (not just to products claims) on grounds of a mutual mistake of expression by the parties in drafting the endorsement: namely, although the endorsement was intended to apply to all asbestos bodily injury claims, the language employed in the endorsement was mistakenly limited to products claims.

41.    Liberty Mutual is entitled to either (a) reformation of the Policies so that the asbestos deductible endorsement applies to all asbestos bodily injury claims (and not just to products claims) or (b) rescission of the Policies, on grounds of a mutual mistake of fact by the

parties in believing, at the time the Policies were issued, that all of the asbestos bodily injury claims against Armstrong were products claims when, if Armstrong's current position is accepted, many of them in fact would be classified as non-products claims.

42.    Armstrong disputes these conclusions and contends contrariwise that Liberty Mutual is not entitled to reformation or rescission of the Policies on grounds of mutual mistake. This dispute constitutes an actual and justiciable controversy between the parties.

43.    WHEREFORE, on Count IV, Liberty Mutual demands judgment declaring that: Liberty Mutual is entitled to reformation of the language of the asbestos deductible endorsement in the Policies so that it applies to all asbestos bodily injury claims (not just to products claims) on grounds of:

(a) a mutual mistake of expression by the parties in drafting the endorsement: namely, although the endorsement was intended to apply to all asbestos bodily injury claims, the language employed in the endorsement was mistakenly limited to products claims; or

(b) a mutual mistake of fact by the parties in mistakenly believing at the time the Policies were issued that all of the asbestos bodily injury claims against Armstrong were products claims when, if Armstrong's current position is accepted, many of them in fact would be classified as non-products claims.

Alternatively, Liberty Mutual is entitled to rescission of the Policies, on grounds of the parties' mutual mistake of fact, as described above.

**Count V: For A Declaration That Armstrong Is Estopped
From Asserting That More Than 7% Of The Claims Against It
Are Non-Products Claims**

44.     Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

45.     During the period from 1973, when the first Liberty Mutual policy was issued to Armstrong, through the early 1980s, Armstrong and Liberty Mutual believed and understood that virtually all of the asbestos bodily injury claims asserted against Armstrong were products claims. Armstrong's General Manager for Insurance believed that Armstrong was being held liable in asbestos bodily injury cases "because we were a manufacturer and distributor of products containing asbestos." An Armstrong filing with the Securities and Exchange Commission in mid-1984 reported that "[n]early all [of the thousands of asbestos bodily injury] suits and claims [against Armstrong] allege exposure to asbestos-containing insulation products manufactured or sold by the Company." Since Armstrong was actively involved in defense of the claims and had superior knowledge about its own historical business activities, Liberty Mutual had no reason to disagree with Armstrong's characterization of the claims as products claims. Indeed, Liberty Mutual repeatedly advised Armstrong that it was classifying the claims as products claims, and provided Armstrong with voluminous reports showing that all of the claims were being classified as products claims and that the products coverage under the policies was rapidly being exhausted. Armstrong did not challenge these classifications.

46.     After Armstrong abruptly changed its position in 1984, and began to assert that non-products coverage should be available for its asbestos claims on the theory that some of these claims arose from its insulation installation activities, Armstrong's new position concerned

Liberty Mutual because the Policies did not contain aggregate limits of liability for non-products claims.

47.     During the first half of 1985, Armstrong devoted considerable effort to getting its insurers -- including Liberty Mutual -- to sign the Wellington Agreement, which was being negotiated by asbestos producers and their insurers.  The Wellington Agreement provided a number of significant advantages for producers such as Armstrong in dealing with the asbestos bodily injury claims against them.  However, any insurer that subscribed to the Wellington Agreement gave up significant rights with respect to its insurance policies.

48.     During early 1985, Liberty Mutual was concerned about Armstrong's new non-products theory and the exposure to which it might subject Liberty Mutual in view of the lack of aggregate limits for non-products claims.  Armstrong knew that Liberty Mutual would not join the Wellington Agreement without an acceptable assurance from Armstrong regarding the percentage of claims that had been resolved against Armstrong that might require reclassification to the non-products category of coverage.

49.     Armstrong provided that assurance.  In April 1985, Armstrong initially told Liberty Mutual that approximately 1,000 out of 25,000 of the claims against it were non-products claims.  When Liberty Mutual sought further assurance from Armstrong regarding the anticipated numbers of non-products claims, Armstrong agreed to conduct a "survey" of the claims that had been resolved against it.  On the day the Wellington Agreement was to be signed in June, Armstrong assured Liberty Mutual that non-products claims had comprised 7% of the total claims resolved against Armstrong.  Armstrong assented to a memorandum recording Armstrong's

assurances that historically the non-products cases have only consisted of approximately 7% of the total number of asbestos related claims. Moreover, the producers' sharing formula [under the Wellington Agreement] will probably decrease this further . . . .

50. Acting in reliance on these representations, Liberty Mutual signed the Wellington Agreement, thereby giving up the substantial rights under the Policies that it otherwise could have asserted in subsequent years as Armstrong's insurer.

51. To comply with its obligations under the memorandum of agreement referred to in paragraph 49 above, Liberty Mutual tendered a $750,000 check to Armstrong in November 1985 with a letter confirming that, "[a]s regards future filed claims," Liberty Mutual was relying on Armstrong's representation that historically 7% of the claims against Armstrong were non-products. Armstrong accepted and cashed the check, and at the same time returned a copy of the above-referenced assurance signed by its counsel.

52. Based upon the statements and conduct of Armstrong described above and Liberty Mutual's detrimental reliance thereon, Armstrong is now estopped from asserting that more than 7% of the asbestos bodily injury claims against it should be classified as non-products claims.

53. Armstrong disputes this conclusion and contends instead that it is not estopped from asserting that more than 7% of the asbestos bodily injury claims against it should be classified as non-products claims. This dispute constitutes an actual and justiciable controversy between the parties.

14

54.    WHEREFORE, on Count V, Liberty Mutual demands judgment declaring that: Armstrong is estopped from asserting that more than 7% of the asbestos bodily injury claims against it should be classified as non-products claims.

**Count VI:  For A Declaration That Certain Types Of Asbestos Bodily Injury Claims Against Armstrong Are Not Covered Under The Policies, Or Are Covered Only To A Limited Extent**

55.    Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

56.    In the past, Armstrong has sought insurance coverage for liability and defense costs arising from the following types of claims and settlements, and upon information and belief, Armstrong will continue to seek such insurance coverage under the Policies:

(a) Claims involving exposure to asbestos during installation after 1957 of a product manufactured by Armstrong or marketed under Armstrong's label;

(b) Claims involving exposure to asbestos during installation after 1957 of a product manufactured by someone other than Armstrong;

(c) Claims by unimpaired claimants that do not involve a compensable medical condition (such as mesothelioma, lung cancer, other cancer, or asbestosis) that amounts to bodily injury under the Policies;

(d) Claims that do not involve evidence of (i) product identification (i.e. exposure to an Armstrong product, or during a pre-1958 Armstrong installation operation) and/or (ii) injury (i.e. existence of a compensable medical condition) sufficient to withstand summary judgment, even if the claim nonetheless would satisfy the criteria set forth in

Armstrong's Asbestos Personal Injury Settlement Trust Distribution Procedures and be payable under such criteria;

(e)    Claims involving the exposure of an employee of Armstrong or its subsidiaries to asbestos;

(f)    Claims that were not tendered to Liberty Mutual, and claims as to which Armstrong failed to cooperate, as required by the Policies; and

(g)    Settlements of claims, including but not limited to the types of claims described in (a) through (f) above, which settlements (i) were not presented to and approved by the insurer before they were consummated or (ii) were not fair, reasonable and non-collusive.

57.    As a matter of law, claims of the type described in paragraph 56(a), to the extent that they constitute otherwise valid claims against Armstrong for which coverage is available under the Policies, would be covered only under the "products hazard" of the Policies.

58.    In the past, Armstrong has asserted that claims of the type described in paragraph 56(a) should be classified as "non-products" claims that do not fall within the "products hazard" of the Policies and, upon information and belief, Armstrong will continue to take the position that such claims are valid claims for which "non-products" coverage exists under the Policies. This dispute constitutes an actual and justiciable controversy between the parties.

59.    As a matter of law, claims and settlements of the types described in paragraph 56(b) through (g) are not valid claims for which coverage is available under the Policies.

60.    In the past, Armstrong has authorized its agents, the Asbestos Claims Facility and the Center for Claims Resolution, to pay claims and settlements of the types described in

paragraph 56(b) through (g) as valid claims and settlements and, upon information and belief, Armstrong will continue to take the position that such claims and settlements are valid claims and settlements for which coverage exists under the Policies. This dispute constitutes an actual and justiciable controversy between the parties.

61.    WHEREFORE, on Count VI, Liberty Mutual demands judgment declaring that:

(a) Liability and defense costs arising from claims that involve exposure to asbestos during installation after 1957 of a product manufactured by Armstrong or marketed under Armstrong's label, if they are otherwise valid claims against Armstrong for which coverage is available under the Policies, are covered only under the "products hazard" of the Policies;

(b) Liability and defense costs arising from claims that involve exposure to asbestos during installation after 1957 of a product manufactured by someone other than Armstrong are not covered under the Policies;

(c) Liability and defense costs arising from claims by unimpaired claimants that do not involve a compensable medical condition (such as mesothelioma, lung cancer, other cancer, or asbestosis) that amounts to bodily injury under the Policies, are not covered under the Policies;

(d) Liability and defense costs arising from claims that do not involve evidence of (i) product identification (i.e. exposure to an Armstrong product or during a pre-1958 Armstrong installation operation) and/or (ii) injury (i.e. existence of a compensable medical condition) sufficient to withstand summary judgment are not covered under the Policies, even if the claim nonetheless satisfies the criteria set forth in Armstrong's

Asbestos Personal Injury Settlement Trust Distribution Procedures and was paid under such criteria;

(e)  Liability and defense costs arising from claims that involve the exposure of an employee of Armstrong or its subsidiaries to asbestos are not covered under the Policies;

(f)  Liability and defense costs arising from claims that were not tendered to Liberty Mutual, and claims as to which Armstrong failed to cooperate, as required by the Policies, are not covered under the Policies; and

(g)  Liability and defense costs arising from settlements of claims, including but not limited to the types of claims described in (a) through (f) above, which settlements (i) were not presented to and approved by Liberty Mutual before they were consummated or (ii) were not fair, reasonable and non-collusive, are not covered under the Policies.

### Count VII:  For A Declaration That Armstrong May Not Expand Its Wellington Coverage Block To Apply Solely To Non-Products Claims

62.    Liberty Mutual reasserts and incorporates herein each of the allegations set forth in paragraphs 1-8 above.

63.    By letter dated July 13, 2000, Armstrong notified Liberty Mutual that, upon exhaustion of the Liberty Mutual policies for the years 1973 through 1976, Armstrong would expand its coverage block under the Wellington Agreement to include the Liberty Mutual policy for 1977, but would do so only "for amounts allocable to the non-products classification" under the policy.

64.    Each of the Policies, including the policy for 1977, provides coverage both for "products" claims (those falling under either the "products hazard" or the "completed operations

hazard") and for "non-products" claims.  Under the provisions of the Policies, Armstrong must pay Liberty Mutual an additional premium for asbestos claims handled under both products coverage and non-products coverage.  Armstrong is attempting to avoid paying the additional premium for asbestos products claims by invoking coverage only under the non-products classification of the 1977 policy.

65.     The Wellington Agreement does not permit a policyholder such as Armstrong to expand its Wellington coverage block by selectively invoking coverage under only one claims classification (that is, the non-products classification) while omitting the other claims classification (for products claims) under the same policy.  Under Section IX.1 of Wellington, in order properly to expand its coverage block, a policyholder like Armstrong must add an "insurance policy," meaning the full coverage under the policy, including both the products and non-products classifications.

66.     Armstrong disputes this conclusion and contends instead that it may expand its Wellington coverage block by adding only the non-products coverage under the 1977 policy and omitting the products coverage under that same policy.  This dispute constitutes an actual and justiciable controversy between the parties.

67.     WHEREFORE, on Count VII, Liberty Mutual demands judgment declaring that: Armstrong may expand its coverage block under the Wellington Agreement only by adding the full coverage afforded by the 1977 policy including claims within both the products and the non-products classifications, and may not selectively add only coverage for claims that fall within the non-products classification.

## JURY DEMAND

Liberty Mutual demands a trial by jury on all issues so triable in the complaint and the counterclaims.

Respectfully submitted,

LIBERTY MUTUAL INSURANCE
COMPANY

By its attorneys,

Dated:  October 19, 2006

/s Jason A. Syderman
Edward F. Mannino
Jason A. Snyderman
Akin, Gump, Strauss, Hauer & Feld, L.L.P.
One Commerce Square
2005 Market Street
Suite 2200
Philadelphia, PA  19103
(215) 965-1200

and

A. Hugh Scott
John A. Nadas
Choate, Hall & Stewart, LLP
Two International Place
Boston, MA 02110
(617) 248-5000

3770397

## CERTIFICATE OF SERVICE

I, Jason A. Snyderman, Esquire, hereby certify that on October 19, 2006, a true and correct copy of the Counterclaims and Jury Demand of Liberty Mutual Insurance Company were served upon the following:

**<u>Via Hand Delivery</u>**

Howard M. Klein, Esquire
Conrad, O'Brien, Gellman & Rohn, P.C.
1515 Market Street, 16th Floor
Philadelphia, PA 19102

**<u>Via E-Mail</u>**

William P. Skinner, Esquire
Covington & Burling
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401

/s Jason A. Snyderman
Jason A. Snyderman