UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ARMSTRONG WORLD INDUSTRIES, INC. )
PERSONAL INJURY SETTLEMENT TRUST, )
                                                               Plaintiff, )
                         v. )   Civil No. 02-CV-4360-RBS
LIBERTY MUTUAL INSURANCE COMPANY, )
                                                               Defendant. )

## LIBERTY MUTUAL'S MEMORANDUM IN SUPPORT OF BIFURCATION

Liberty Mutual Insurance Company ("Liberty Mutual") submits this memorandum in support of its request that the Court adopt a schedule which bifurcates from the rest of this case those matters involving expert estimation of (i) the number and/or value of asbestos claims against Armstrong World Industries, Inc. ("Armstrong") and (ii) the percentage of such asbestos claims that fall within the so-called "non-products" coverage (collectively, the "estimation issues").

The estimation issues which Liberty Mutual seeks to defer involve complex and sophisticated quantitative expert analysis, which will be both extraordinarily costly and time-consuming for the parties, and burdensome for the Court to resolve. History teaches that such expert work in the area of asbestos claims is uniquely burdensome in terms of its sophistication, complexity and cost. And, such expert work will be entirely

1

unnecessary in the case if the Court agrees with Liberty Mutual either (i) that coverage is barred or substantially limited by any one of several defenses, or (ii) that, even if coverage does exist, the proper measure of damages does not require any estimation of potential future claims. The plaintiff Armstrong World Industries, Inc. Personal Injury Settlement Trust (the "Trust") will not be prejudiced by bifurcation, because the Trust already has substantial financial resources to pay any legitimate claims that may be allowed while the Court resolves the coverage issues.

Liberty Mutual does not seek to defer *any* fact discovery of evidence relating to the nature or quantity of the claims against Armstrong, and the Trust will be free to develop and present all such evidence that is relevant and admissible to resolve the question whether coverage exists for such claims. All Liberty Mutual seeks to bifurcate and defer is the *expert* analysis, reports, and testimony on the estimation issues.[1]

## I. BACKGROUND

### A. Expert Estimation Of Asbestos Claims Is Complex And Expensive, And Should Be Deferred Unless And Until It Is Determined To Be Necessary.

The complexity of expert estimation of asbestos claims is evident from the body of case law that has dealt with these issues in recent years. *See, e.g., In re Federal-Mogul Global Inc.*, 330 B.R. 133, 133-64 (D. Del. 2005) (a thirty-one page opinion devoted solely to "determining an estimation of liability" of asbestos claims); *Owens Corning v. Credit Suisse First Boston*, 322 B.R. 719, 719-26 (D. Del. 2005) (addressing competing estimations of future contingent asbestos claims and emphasizing the "substantial"

---

[1] Both parties would, of course, reserve the right to seek focused discovery during the expert phase in the event that specific information is needed by their experts to conduct their analyses and prepare their reports. For example, if an expert's report required analysis of information about a random sample of claims, discovery of that information could not occur until after the expert had started his or her work, and had first designed and drawn the sample of claims to be reviewed.

2

margin for error when estimating "uncertainties" of claims valuation where "[r]elatively minor variations . . . can skew the end result enormously"); *In re G-I Holdings, Inc.*, Nos. 01-30135 (RG), 01-38790 (RG), 2006 WL 2403531, *1-*24 (Bankr. D.N.J., Aug. 11, 2006) (addressing discovery disputes raised by parties' competing asbestos claims estimation methodologies within a 24-page opinion).

As these cases make clear, estimation of asbestos claims typically involves competing expert reports and analysis, frequently by multiple experts. Estimation methodologies often require complex epidemological modeling, statistical analysis, and detailed review of large bodies of historical claims files. Courts dealing with estimation issues must usually resolve competing expert opinions on exceptionally abstruse issues, where even the slightest changes in assumptions can mean huge swings in the results.

The abstract concept of the complexity of asbestos claims estimation is, however, made specific and tangible by the history of recent litigation involving the asbestos claims against Armstrong. As the Court is aware, in the mid 1990s, Armstrong commenced an arbitration against Liberty Mutual, in which Armstrong sought non-products coverage under the 1973 - 76 policies. In support of its new position that non-products claims comprised a substantial majority of the total claims against Armstrong, Armstrong retained an expert consulting firm, Peterson Consulting (and one of its principals, William Jones), and an alleged expert statistician, Dr. Wanda Wallace, to opine on the non-products percentage. Those experts engaged in a claims review process that spanned two years and cost Armstrong at least $4.4 million. Presentation of the expert estimation evidence took *eight days* of trial time before the arbitrator at the initial damages assessment hearing, and *five days* of trial time on re-hearing of the damages

case. Several years later, when Armstrong was in bankruptcy, it retained the expert consulting services of Dr. Mark Peterson (who is not affiliated with Peterson Consulting) to estimate Armstrong's total liability for asbestos claims. His work spanned months and reportedly cost Armstrong about $1.2 million. Other parties in the bankruptcy proceeding incurred more than $4.5 million in expenses related to expert estimation work. The district court conducted a *three-day* hearing on estimation issues in the bankruptcy case. In toto, Armstrong and other parties spent more than $10 million in the arbitration and the bankruptcy for estimation experts.

None of this prior work is relevant to or admissible in the present lawsuit dealing with coverage under the 1977 - 81 policies for a number of reasons. *First*, a stipulation reached by the parties during Armstrong's bankruptcy proceedings and approved by this Court precludes use of any bankruptcy estimations in the present coverage case. *See* Stipulation and Order (dated as of August 29, 2003 and approved by this Court on October 10, 2003), at ¶ 9. *Second*, the pool of claims analyzed and at issue in the arbitration and the bankruptcy proceedings differs substantially from the pool of claims that will arise post-bankruptcy. Those earlier claims spanned the period from the early 1980s through 1994, ending approximately thirteen years before the first post-bankruptcy claim. *Third*, unlike the 1973 -76 policies that were at issue in the arbitration, the 1977 - 81 policies at issue in this case are not subject to arbitration. Rather, the Wellington Agreement entered by Armstrong and Liberty Mutual in 1985 expressly provides that disputes regarding the 1977 - 81 policies must be resolved by litigation. *See* Wellington

Agreement, §§ XVI.B.1 and XVII.B.[2] Consequently, expert estimations from the arbitration can have no effect in the present case.

So, the Trust now proposes prematurely to force both parties down this same complex, expensive, and time-consuming estimation path anew, in the hope that the Trust will be able (i) to prove coverage (which Armstrong failed to do in the arbitration) and (ii) to show that damages based on an estimation of possible future claims are permissible.

### B. The Estimation Issues Are Completely Irrelevant To The Substantive Issues And The Requested Relief Which Are The Focus Of This Case.

The Complaint and the Counterclaim collectively contain fourteen counts that assert eleven separate claims. Ten of these claims seek *declaratory judgment* guidance from the Court on a variety of substantive issues regarding the construction and application of the 1977 - 81 Liberty Mutual insurance policies to asbestos bodily injury claims against Armstrong. Only in the eleventh claim does the Trust make a claim against *one* of those six policies that potentially implicates the estimation issues, namely, the Trust's claim for damages arising from the alleged breach of the 1977 policy.

The heart of this case is whether asbestos bodily injury claims against Armstrong fall within the "non-products" coverage of the Liberty Mutual policies. Those policies contain "products/completed operations" coverage, which is subject to aggregate limits, and "premises/operations" coverage (commonly referred to as "non-products" coverage), which has no aggregate limits. Prior to 1958, Armstrong installed some asbestos-

---

[2] The Wellington Agreement is formally titled the "Agreement Concerning Asbestos-Related Claims" dated June 19, 1985, a copy of which has been submitted to the Court as Exhibit 1 in the volumes of exhibits provided to the Court regarding the vacatur and confirmation motions pending before this Court in *Armstrong World Industries, Inc. v. Liberty Mutual Insurance Company*, No. 04-CV-0499-RBS (the "Vacatur/Confirmation Case").

5

containing insulation products. From 1958 to 1969, a separate Armstrong subsidiary corporation conducted those installation operations. The Liberty Mutual policies were issued beginning in the 1970s, years after the last asbestos installation operation was completed. Claimants have asserted claims against Armstrong for progressive injury allegedly incurred during the Liberty Mutual policy periods long after the installation operation was completed, but allegedly arising from exposure to asbestos during that operation.[3] Whether such claims fall within "completed operations" coverage or "non-products" coverage is a key issue.

Because this case focuses on a judicial declaration of the proper construction and application of the six policies, *even if the estimation issues are bifurcated*, and assuming arguendo that the Trust were able to prevail on the substantive coverage issues presented in the Complaint and Counterclaim, the Court would still be able *immediately* to grant the Trust *all* the relief that it seeks on five of the policies at issue and the vast majority of the relief it seeks on the 1977 policy – namely, declaratory judgment on the coverage issues. Of course, if the Trust fails to prove coverage, the estimation issues will be entirely moot.

## II. BIFURCATION IS WARRANTED UNDER GOVERNING LEGAL PRINCIPLES.

Fed. R. Civ. P. 42(b) permits the Court "in furtherance of convenience . . ., when separate trials will be conducive to expedition and economy, [to] order a separate trial . . . of any separate issue."[4] A district court has "broad discretion" in deciding whether to

---

[3] A more detailed description of this factual background, along with citations to supporting evidence, is provided at pages 4 - 7 of Liberty Mutual's Memorandum In Support Of Confirmation [etc.] dated March 15, 2004, filed in the Vacatur/Confirmation Case.

[4] Fed. R. Civ. 42(b) provides in full:

> **(b) Separate Trials.** The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of

6

bifurcate the issues of liability and damages. *See Idzojtic v. Pennsylvania Railroad Co.*, 456 F.2d 1228, 1230 (3d Cir. 1972). The decision is to be made on a case-by-case basis, by the "informed exercise of discretion on the merits of each case." *See Lis v. Robert Packer Hosp.*, 579 F.2d 819, 824 (3d Cir. 1978). Where bifurcation is appropriate, separate issues may be decided in separate trials. *See Anastasio v. Schering Corp.*, 838 F.2d 701, 704 (3d Cir. 1988).

### A. Bifurcation May Obviate The Need To Try The Complex Estimation Issues In This Case.

Bifurcation is particularly appropriate "where litigation of one issue may obviate the need to try another issue." *Nyazie v. Kennedy*, No. Civ. A. 97-0120, 1998 WL 472504, at *2 (E.D.Pa. Jul. 27, 1998) (granting bifurcation of liability and damages). There, the court noted the desirability of bifurcated proceedings when the decision on liability potentially eliminates "the need for a whole array of experts, exhibits and records, severely shortening the length of trial, conserving substantial amounts of money on both sides and eliminating the need for additional witnesses to come to court and testify." *Id.* at *3. That is precisely the situation in the present case, at two levels: *first*, Liberty Mutual has substantial and potentially dispositive defenses to the threshold issue of whether coverage exists for the Armstrong asbestos claims; and, *second*, even if coverage does exist, the case law holds that no estimation of asbestos claims is necessary to award any damages that are due.

---

any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

7

### *1. Liberty Mutual Has Substantial And Dispositive Defenses To Coverage.*

The essence of the Trust's position in this case is that a substantial portion of the asbestos bodily injury claims against Armstrong are so-called "non-products" claims for which the policies provide coverage without any aggregate limits. Liberty Mutual has asserted a number of defenses any one of which, if successful, would mean no (or quite limited) coverage for Armstrong's asbestos claims under the non-products coverage afforded by the policies. For example:

- **Wallace & Gale.** The Fourth Circuit, in a case on all fours with the present case, has held that asbestos claims arising from a company's operations must be classified as "completed operations" claims (which are subject to aggregate limits) - and *not* "operations" or "non-products" claims (which are not subject to aggregate limits) - under insurance policies that were issued after the operation that gave rise to the claim was completed. *See In re Wallace & Gale Co.*, 385 F.3d 820 (4th Cir. 2004). Several subsequently-decided cases have concurred in this view, and Liberty Mutual is aware of no contrary case authority. Under this precedent, since all of the Liberty Mutual policies were issued years after Armstrong and its subsidiaries ceased asbestos operations, *none* of Armstrong's asbestos claims could be non-products claims. If this Court concurs with the Fourth Circuit and all of the other courts that have addressed the issue, this case will be over.

- **Statute of limitations.** As early as 1984, Armstrong believed that non-products coverage was available for its asbestos claims.

8

By 1985, Armstrong knew that Liberty Mutual denied that such coverage was available, and Armstrong endeavored to assert a claim for non-products coverage in pre-existing coverage litigation. The court declined to permit the amendment because the litigation was already very complex and told Armstrong to pursue its claim for non-products coverage elsewhere. Twenty years later, Armstrong finally initiated an arbitration seeking coverage, and more than twenty-five years later, Armstrong instituted the present case. Thus, Armstrong's claim for non-products coverage is barred by Pennsylvania's governing four-year statute of limitations for contract actions. *See* 42 Pa. Cons. Stat. Ann. § 5525(8) (2007). This was the conclusion of the Appellate Panel in the arbitration regarding the 1973 - 76 policies. If this Court reaches a similar conclusion regarding the 1977 - 81 policies, this case will be over.

- **Single occurrence.** Under a long line of Pennsylvania cases, all individual claims by persons alleging asbestos injury against a policyholder-company constitute a single "occurrence" under the policyholder's insurance policy, because all such claims arise from a single root cause, the company's dealings with asbestos-containing products. *See, e.g., Liberty Mut. Ins. Co. v Treesdale, Inc.*, 418 F.3d 330, 339 (3d Cir. 2005) ("[W]e hold that . . . all of the asbestos [bodily injury] claims here arose from a single occurrence . . . ."). Each of the five Liberty Mutual policies at issue in this case contains a $1 million limit of liability for each occurrence. Since all the asbestos claims constitute a

single occurrence, upon Liberty Mutual's tender and payment of its applicable occurrence limits, this case will be over.

- **Reformation of the policies.** As asbestos claims against Armstrong began to accelerate in the mid 1970s, Liberty Mutual informed Armstrong that Liberty could not continue to insure against any asbestos claims unless tighter constraints were imposed on such coverage. The parties agreed to introduce a deductible of $50,000 per asbestos claim and special aggregate limits for asbestos claims into the 1977 policy (collectively, the "deductible endorsement"). The deductible was increased to $100,000 in 1981. During this time period, both Armstrong and Liberty Mutual believed that all of Armstrong's asbestos claims fell within the "products" coverage. Accordingly, the deductible endorsement was written to cover "products" claims. Since then, Armstrong has conveniently changed its position and asserted that most of its asbestos claims are "non-products" claims. If Armstrong's assertion is correct, then the deductible endorsement must be reformed to encompass both "products" and "non-products" claims because the parties' intent was that the deductible endorsement would apply to all asbestos claims. By limiting the text of the deductible endorsement to "products" claims, Liberty Mutual made a mistake of expression in drafting, based upon the parties' mutual mistake of fact that all the asbestos claims were "products" claims. If the policies are reformed in this manner, Liberty Mutual's liability for any of Armstrong's "non-products" claims will be limited to

amounts that exceed the $50,000 (later, $100,000) deductible, and an aggregate limit will apply to the asbestos claims. Thus, the scope of this case will be greatly reduced.[5]

In its response to this memorandum, the Trust will doubtless raise many technical arguments which it says should preclude Liberty Mutual from prevailing on these defenses to coverage. There are persuasive answers to such technical defenses, but briefing on the bifurcation issue is not the proper forum to resolve the merits of the case. Rather, Liberty Mutual describes these four defenses solely to make the incontrovertible point that several potentially meritorious defenses exist, a number of which present legal questions that could potentially be resolved by the Court through dispositive motion practice, and any one of which, if successful, could bar or substantially limit non-products coverage for Armstrong's claims, thus rendering any consideration of the expert estimation issues moot.

### 2. Even If Coverage Exists, No Claims Estimation Is Needed Or Permissible To Award Damages.

Even if the Court were to find that some coverage does exist under the policies for Armstrong's non-products claims, there still would be no need to address the expert estimation issues in order to grant the Trust all of the relief to which it would be entitled. As noted above, ten of the eleven claims advanced by the parties seek declaratory judgment on various aspects of construction and application of the policies. These counts do not seek *any* monetary relief that would implicate the need to quantify by expert estimation the dollar amount of claims. Only the Trust's claim that Liberty Mutual has

---

[5] Liberty Mutual has asserted a number of additional defenses, each of which it reserves the right, and intends, to fully pursue. For purposes of focusing its bifurcation argument for the Court, Liberty has cited only the four defenses noted above, without waiving or withdrawing any of its additional defenses.

11

breached the 1977 policy seeks dollar damages. And even if the Trust were to prevail on this claim, no expert estimation work would be needed in order to award the Trust all of the monetary relief to which it would be entitled, because the Trust is not entitled to the up-front lump sum payment of estimated liability for possible future claims that it apparently may seek. Rather, the Trust would only be entitled to payment of individual claims as presented. No expert estimation is required for this.

The Trust's apparent damages theory, which would require the estimation of Armstrong's possible future liability for asbestos claims and an immediate award of that dollar estimate as an up-front lump sum of damages assessed against Liberty Mutual if coverage is found, has been squarely rejected. *See Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716, 741-46 (Ct. App. 2d Dist. 2006) ("We . . . find no authority – and decline to create any – that would permit a jury to estimate the aggregate sum of an insured's liability for present and potential future asbestos claims for the purpose of accelerating its insurers' obligations."). The ruling that an insurer is not liable to pay an immediate lump sum for estimated possible future claims is an unremarkable application of the fundamental principal of insurance that an insurer should pay claims as they are actually incurred and presented. To accelerate payment of *possible* future claims would deprive insurers of their right to evaluate and pay individual, actual claims as presented, as well as the benefit of the time value of money invested by the insurer (which is necessary to ensure sufficient reserves to pay future claims). In short, insurance does not work the way the Trust proposes.

Hence, even if coverage were to be found for Armstrong's asbestos claims, the Trust would *not* be entitled to a quantified award of "damages" amounting to an up-front

12

lump sum payment for possible future claims. Rather, the relief to which the Trust would be entitled would be the payment on an as-presented basis of any claims which, based on their individual facts, fell within the non-products coverage of the policies. This means that both an estimate of Armstrong's aggregate asbestos liability and the non-products percentage of those claims is entirely unnecessary (indeed, inappropriate), and any such expert estimation work should be deferred until the Court has determined this issue.

### B. The Expert Estimation Issues Are Wholly Distinct From The Rest Of This Case.

District courts within Pennsylvania have indicated that bifurcation is appropriate when issues are wholly distinct and not intertwined or overlapping. In a recent insurance case, a bifurcation order was entered separating the issue of whether a breach of duty had occurred from the issue of individual damages that may have flowed from that breach, because the issues were "wholly distinct." *Koch v. First Niagara Risk Management, Inc.*, C.A. Nos. 04-4711, 05-6696, 2006 WL 2794166, at *2 (E.D.Pa. Sept. 27, 2006). The damages phase of that case was particularly complex because it involved proof by twenty different plaintiffs. *See id.* at *1. Among the benefits of bifurcation, the court noted that it would obviate the necessity of preparing the damage case until after a verdict on liability, and would permit the parties to explore the possibility of settlement if there were a liability verdict. *See id.* at *2. *See also Goldman v. RadioShack Corp.*, No. Civ. A. 03-0032, 2005 WL 1155751, at *1 (E.D.Pa. May 13, 2005) (granting bifurcation where it "promotes judicial expedition and economy by limiting evidence to that which is essential to the disposition of the case" and "the standards and evidence required to prove liability are entirely different than the evidence required to prove damages").

13

The expert estimation issues are wholly distinct and entirely different from the issues that relate to (i) whether coverage exists, and (ii) whether as a matter of law damages can be collected for possible future contingent claims. Resolution of the coverage claims will turn, first and foremost, on the interpretation of the language in the six insurance policies at issue in the case. *See Madison Construction Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106, 108 (Pa. 1999) ("The polestar of our inquiry . . . is the language of the insurance policy. . . . The court's only aim . . . must be to ascertain the intent of the parties as manifested in the language of the written instrument." (quotation omitted)). To the extent, if at all, that extrinsic evidence - such as evidence of the parties' prior conduct, Armstrong's prior history of dealing in asbestos products, the true nature of the claims, and the like - is relevant and admissible, the bifurcation proposed by Liberty Mutual will permit full discovery and exploration of such evidence, subject, of course, to the usual constraints on discovery.

In its opposition to bifurcation in the Joint Case Report (the "Report") and at the Initial Pretrial Conference (the "Conference"), the Trust argued that, in order to present its case for non-products coverage, it needed (i) testimony from former Armstrong employees that Armstrong's involvement with asbestos-containing materials consisted primarily of contracting (*see* Report at 16), (ii) expert statistical evidence that Armstrong derived significant revenues from contracting (*see id.*), (iii) evidence that the bulk of its tort liability arose from its contracting activities (*see id.*), and (iv) evidence of the supposed industry custom and practice and the parties' prior conduct (argument at Conference). Bifurcation of the narrow issue of expert estimations will not prevent the

14

Trust from pursuing *any* of this evidence or, indeed, any other evidence except expert estimations.

The Trust attempts to make the expert estimation evidence relevant to the threshold question of coverage by arguing that it supposedly "bears directly" on Liberty Mutual's knowledge and good faith when it allegedly "misclassified" claims as products claims. *See* Report at 16. This is not so. *First*, even with bifurcation, the Trust remains free to pursue evidence that a great many asbestos claims were asserted against Armstrong, for whatever relevance that evidence may have to any issue. However, a precise expert estimation of the supposed dollar value of Armstrong's total hypothetical future liability for products and non-products claims has nothing whatsoever to do with whether such claims are covered under the policies. Whether the claims amount to $1 or $100 gives no guidance as to whether they are covered under the policies. *Second*, even with bifurcation, the Trust remains free - as noted above - to pursue evidence regarding Armstrong's historical business activities and the nature of the claims against Armstrong, for whatever relevance that may have to any issue. The finder of fact will be able to determine from the historical evidence whether many or few of the claims were non-products claims. The finder of fact needs no expert to opine on the precise percentage of supposed non-products claims, and, indeed, such hypothetically precise testimony would interfere with the role of the fact finder on coverage issues. The only conceivable relevance of precise estimates by experts of total liability and non-products percentage is to a quantification of possible dollar damages - if the Court finds that such damages for hypothetical future claims liability are recoverable at all.

15

Because the expert estimation work relates solely to the possible quantification of a dollar figure or figures for purposes of damages that might be awarded on the single count of the complaint that seeks monetary recovery on the 1977 policy, that work is "wholly distinct" from the remainder of the case and should be bifurcated. *See Koch*, 2006 WL 2794166, at *2.

### III. CONCLUSION

This Court recently observed that bifurcation "is not routinely to be ordered" simply because a finding of no liability would obviate the need for proof of damages because "such is the case with every civil case in this courthouse." *See James v. Interstate Credit and Collection, Inc.*, No. Civ. A. 03-CV-1037, 2005 WL 2989305, at *1-*2 (E.D.Pa. Aug. 2, 2005). However, as demonstrated above, the present case is far from routine in terms of the complexity, expense and effort that will be required to address the expert estimation issues. It is also far from routine in terms of the substantial defenses presented, any one of which would moot the need for the expert estimation effort.

The advantages to the parties and the Court of bifurcation would be significant here. It would shorten the schedule for addressing the merits of the significant coverage issues, from fifteen months to thirteen months. Although this is only a short saving of time, it will mean a huge saving in terms of cost and effort. In order to timely complete fact discovery and deal with the expert estimation issues simultaneously, the parties will effectively have to "double track" their efforts, immediately retaining experts and adding substantial resources to their teams in order to meet the schedule. This potentially unnecessary expense will be considerable. The Court observed at the Conference that the

schedules proposed by the parties seemed to be ambitious in view of the complexity of the case and the number of issues involved. Requiring the parties to address the expert estimation issues at the same time that they conduct discovery on the many underlying substantive issues will necessitate a Herculean commitment of time and money by the parties. Requiring the parties to present the expert estimation evidence at the initial trial will prolong and complicate the trial, potentially wasting the Court's time and immersing the Court in complex issues that it may never need to consider.

Bifurcation will not prejudice the Trust, even if the Trust is able ultimately to establish both coverage and its entitlement to accelerated damages for future possible claims. The Trust already has substantial resources to meet its commitments to pay legitimate asbestos claims. At its creation in 2006, the Trust was funded with stock constituting a two-thirds ownership interest in Armstrong worth approximately $1.3 billion, and with approximately $738 million in cash. The Trust's balance sheet for year-end 2006 showed more than $2.2 billion in assets. To the best of Liberty Mutual's knowledge, the Trust has not yet begun to pay claims. Thus, any delay in a recovery of insurance proceeds from Liberty Mutual occasioned by bifurcation of the estimation issues will not interfere with the Trust's ability to pay claims. Contrary to the suggestion of the Trust at the Conference, there is no need to rush to judgment here.

Indeed, focusing at this point in the litigation on the merits of Liberty Mutual's defenses may well actually hasten the resolution of this complex dispute. As noted above, one of the reasons that the court in the *Koch* case found bifurcation to be in the interest of all parties was that it would give the parties the opportunity to explore settlement if there were to be a finding of liability. *See* 2006 WL 2794166, at *2. The

same holds true here. This is not a "fender bender" case where trial of the liability issue will take a couple of hours and proof of damages will require only presentation of a repair shop bill. As is the case with asbestos litigation in general, the issues here are many and complex, and the parties are presently poles apart on the coverage issues. Guidance from the Court in resolving the substantive coverage issues may well facilitate a resolution of the overall case.

For these reasons, Liberty Mutual respectfully submits that, while bifurcation is not to be routinely granted, this is precisely the type of case where bifurcation of the expert estimation issues is likely to lead to the most efficient and cost-effective resolution of this case.

Respectfully submitted,

LIBERTY MUTUAL INSURANCE COMPANY

By its counsel,

_/s/ A. Hugh Scott_
A. Hugh Scott
Kathleen Cloherty Henry
Choate, Hall & Stewart LLP
Two International Place
Boston, MA 02110
(617) 248-5000

and

John C. Sullivan
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808
(215) 587-1000

Dated: November 6, 2007

4268068