# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ARMSTRONG WORLD INDUSTRIES, INC. ASBESTOS PERSONAL INJURY SETTLEMENT TRUST,<br><br>Plaintiff,<br><br>v.<br><br>LIBERTY MUTUAL INSURANCE COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. 02-CV-4360-RBS<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OF PLAINTIFF ARMSTRONG WORLD INDUSTRIES, INC. ASBESTOS PERSONAL INJURY SETTLEMENT TRUST IN OPPOSITION TO REQUEST OF DEFENDANT LIBERTY MUTUAL INSURANCE COMPANY FOR BIFURCATION

## I.    INTRODUCTION

Liberty Mutual Insurance Company ("Liberty Mutual") has moved under Fed. R. Civ. P. 42 to bifurcate this case into a "liability" phase and a "damages" phase. Such an evidentiary distinction is not possible in this case. Rather, the evidence of "damages" that Liberty Mutual seeks to exclude from the "liability" phase of this case is inextricably intertwined with the evidence that the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust (the "Trust") will offer to prove Liberty Mutual's liability. Thus, Liberty Mutual has not established (as Rule 42 requires) that bifurcation would promote judicial economy and would not prejudice the Trust. The motion therefore should be denied.

The key issue in this case is whether the Trust's liability for asbestos-related bodily injury claims arose from the installation of asbestos-containing insulation materials rather than the manufacture or sale of such materials. The expert testimony that Liberty Mutual seeks to

exclude bears directly on this issue. That testimony will show that a large percentage of the asbestos-related liabilities that the Trust inherited from its predecessor, Armstrong World Industries, Inc. ("Armstrong"), results from exposures to asbestos during the installation, not the manufacture or sale, of asbestos-containing insulation materials by Armstrong and its wholly-owned subsidiary. This evidence goes to the heart of this litigation: Liberty Mutual's liability for hundreds of thousands of bodily injury claims arising from asbestos exposure during such installation.

The specific expert testimony that Liberty Mutual seeks to exclude involves two distinct but related opinions that will be offered by a single "estimation expert": (i) an estimation of the percentage of asbestos-bodily injury claims that arose out of installation activities (which therefore should be classified as "non-products claims" under the Liberty Mutual insurance policies at issue); and (ii) an estimation of the magnitude of liability for asbestos-related bodily injury claims that the Trust will face as Armstrong's successor.

To reach these opinions, the expert will review the data for each claimant to obtain information about the sites at which the claimant alleged exposure to asbestos, the dates when such exposure occurred, and other relevant information relating to the alleged involvement of Armstrong or its wholly-owned subsidiary. The expert will match the times and places that the claimants worked with the times and places that Armstrong or its wholly-owned subsidiary installed insulation. To estimate the magnitude of the Trust's future liability, the expert also will consider the historical asbestos-related experience of Armstrong, including historical settlement values.

All of this expert evidence forms a crucial part of the Trust's case-in-chief, which will establish that Liberty Mutual is liable for non-products claims under the insurance policies at

issue.  Indeed, this evidence will support the testimony of Armstrong's former employees that Armstrong's involvement with asbestos-containing insulation materials arose principally from the installation activities of Armstrong and its wholly-owned subsidiary.

The estimation evidence also is directly relevant to Liberty's course of conduct in handling Armstrong's asbestos bodily injury claims.  In handling those claims, Liberty Mutual had an obligation to inquire into the nature of the claims to determine whether they should be classified as products or non-products claims under the applicable insurance policies.  Instead, Liberty Mutual decided to classify all asbestos-related claims as products claims.  Had Liberty Mutual complied with its obligation to handle the claims properly, it would have confirmed that the bulk of those claims were non-products claims – which is precisely what the expert evidence here will show.

In sum, the exclusion of expert testimony that Liberty Mutual argues is relevant only to the Trust's claim for "damages" would not promote judicial economy and would prejudice the Trust.  Trying liability and estimation issues separately, when the evidence required to prove them is so intertwined, inevitably will result in (a) discovery disputes over what is a liability issue and what is an estimation issue and (b) unnecessary additional costs for a second trial that will involve duplicative evidence.  More importantly, separate trials would delay for an indefinite period of time the awarding of damages to the Trust and the benefits that this money would bring to many thousands of asbestos claimants, who presently stand to receive only one-fifth of their claimed damages.  Thus, Liberty Mutual has failed to satisfy the requirements for bifurcation set forth in Fed. R. Civ. P. 42, and the motion to bifurcate should be denied.

## II.    STATEMENT OF FACTS

This is an insurance coverage action.  The Trust is the successor to the asbestos-related liabilities of Armstrong, which for many years installed asbestos-containing insulation materials,

either directly or through a wholly-owned subsidiary, at commercial and industrial job sites across the United States. The Trust is also the successor to Armstrong's rights to insurance coverage for those liabilities.

This action was brought to determine the Trust's rights under insurance policies that Armstrong purchased from Liberty Mutual that cover the period between 1977 and 1981 (the "Policies"). The Policies provide sweeping coverage, obligating Liberty Mutual to pay "all sums" that Armstrong became "legally obligated to pay" for "bodily injury, sickness or disease" during the policy period caused by an "occurrence," which the Policies define as an "accident" or "continuous or repeated exposure" to injurious conditions.

Each of the Policies contains an "aggregate limit" that caps the amount that Liberty Mutual must pay for certain types of tort claims, which the parties refer to as "products" claims. Products claims arise from injuries that happened (a) away from Armstrong's (or its wholly-owned subsidiary's) premises and (b) after Armstrong (or its wholly-owned subsidiary) had completed its installation operations at a job site and relinquished possession of the asbestos-containing insulation materials it was installing. Thus, a claim arising from exposure to asbestos-containing materials that Armstrong manufactured and sold to others would be a products claim because any exposure occurred away from Armstrong's premises and after Armstrong had relinquished possession of the materials.

By contrast, tort claims arising from injuries that began before Armstrong or its wholly-owned subsidiary completed an installation operation and relinquished possession of these materials are known as "non-products" claims. For example, a claim arising from exposure to asbestos-containing insulation materials while Armstrong was installing them would be a non-products claim because the exposure occurred before Armstrong had completed its installation

operation and relinquished possession of the materials. The Policies' aggregate limits do not apply to non-products claims.

The primary issue in this case is the extent to which Armstrong's liabilities arise from non-products claims. The Trust will prove at trial that the vast majority of Armstrong's liabilities result from exposures to asbestos-containing insulation materials while Armstrong or its wholly-owned subsidiary was installing those materials at various job sites, and therefore that these are non-products liabilities. To do so, the Trust will offer two types of proof.

First, the Trust will offer testimony of former Armstrong employees that Armstrong's involvement with asbestos-containing insulation materials consisted primarily of obtaining and performing contracts to install these materials at job sites across the United States. The former employees will testify that these sites included shipyards, refineries, chemical plants, steel plants, and other commercial and industrial sites. At these sites, Armstrong's contracting division would install asbestos-containing materials to insulate pipes and boilers. Armstrong's former employees also will testify that Armstrong manufactured only two asbestos-containing insulation products, each of which was sold in small amounts for only a brief period. Outright sales of asbestos-containing products accounted for only about ten percent of Armstrong's revenues from asbestos insulation. The remaining ninety percent came from Armstrong's installation activities.

The second type of evidence dealing with the non-products issue will be expert testimony in the form of a statistical analysis of the percentage of the asbestos claims that have been brought against Armstrong and the Trust that are attributable to installation activities. This analysis will involve a comprehensive review of the claims brought against Armstrong and the Trust, including dates and locations of alleged exposures; a comprehensive review of the historical installation activities of Armstrong and its wholly-owned subsidiary, including dates

and locations; and a cross-referencing of these groups of data to evaluate the extent to which the claims are non-products claims. Expert testimony offered in Armstrong's Alternative Dispute Resolution Proceeding against Liberty Mutual and other insurers (the "ADR") showed that 74% of Armstrong's asbestos liabilities were attributable to such activities, and the Trust plans to offer similar expert testimony here. This testimony, which Liberty Mutual claims is relevant only to the issue of "damages," in fact will reinforce and support the testimony of Armstrong's former employees regarding Armstrong's historical installation activities.

If this expert testimony is excluded, an essential portion of the Trust's proof will not be heard in the "liability" phase of this case. The fact witnesses who will be testifying about this issue will be testifying about events that occurred from the 1930s through the 1960s. The statistical analysis will go the heart of the credibility of these former employees and will confirm the accuracy of their testimony.

Moreover, the expert estimation evidence is relevant to Liberty Mutual's assertions and credibility because this evidence bears directly on Liberty Mutual's course of conduct in handling Armstrong's asbestos-related bodily injury claims in the 1970s and 1980s. If Liberty Mutual had complied with its obligation to investigate claims to determine whether they should be classified as products or non-products claims, it would have found that a large percentage of Armstrong's claims arose out of installation activities.

## III.    ARGUMENT

A court may order separate trials "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." Fed. R. Civ. P. 42(b). "A defendant seeking bifurcation has the burden of presenting evidence that a separate trial is proper in light of the general principle that a single trial tends to lessen the delay, expense and inconvenience to all parties." *McCrae v. Pittsburgh Corning Corp.*, 97 F.R.D. 490, 491 (E.D.

Pa. 1983); *see also Zurich Ins. Co. v. Health Sys. Integration, Inc.*, No. Civ. A. 97-4994, 1998
WL 211749, at *3 (E.D. Pa. Apr. 30, 1998) (same); *Reading Tube Corp. v. Employers Ins. of
Wausau*, 944 F. Supp. 398, 404 (E.D. Pa. 1996) (party requesting bifurcation must prove "that it
is necessary").

    "Separation of issues for trial is not to be routinely ordered."  *James v. Interstate Credit
& Collection, Inc.*, No. Civ. A. 03-CV-1037, 2005 WL 2989305, at *1 (E.D. Pa. Aug. 2, 2005)
(Surrick, J.) (citing *Lis v. Robert Packer Hospital*, 579 F.2d 819, 824 (3d Cir. 1978)).  On the
contrary, "bifurcation is an infrequent exception."  *Nathanson v. Aetna Cas. & Sur. Co.*, No. 01-
CV-3377, 2001 WL 1392165, at *1 (E.D. Pa. Nov. 7, 2001) (citing 9 Wright & Miller, *Federal
Practice and Procedure* § 2388 at 474 (2d ed. 1994)).  Liberty Mutual has failed to demonstrate
that this case constitutes the "infrequent exception."

## A.    Liberty Mutual Has Failed To Meet Its Burden To Establish That Bifurcation Will Promote Judicial Economy.

    Liberty Mutual has not established that "judicial economy would be promoted" by
bifurcation.  *James*, 2005 WL 2989305, at *1.  As the court stated in *McCrae*, bifurcation is "an
extraordinary measure to be used where it is clearly economical."  97 F.R.D. at 494.

    Separating the liability and damages phases of this case will not be "clearly economical."
There is significant overlap in the evidence that the Trust will present as to all counts in the First
Amended Complaint, which will result in the Trust having to introduce much of the same
evidence at both the first and second trials if bifurcation is allowed.  Counts One to Six and Eight
of the First Amended Complaint, the Trust's so-called "liability" claims, seek declarations
regarding the existence and extent of the Trust's rights to coverage for non-products asbestos
claims under all of the Policies.  Count Seven of the First Amended Complaint, the so-called

"damages" claim, seeks an award of damages under the 1977 Policy based on Liberty Mutual's breach of its obligation to provide coverage for non-products asbestos claims under that Policy.

In order to establish Liberty Mutual's liability under all the Policies – including the 1977 Policy – the Trust will present evidence regarding the nature and amount of installation activities, the times and places that insulation was installed, the types of asbestos-related diseases that resulted, and the claims that have been asserted by persons exposed to asbestos-containing insulation materials during the installation work. The Trust will bolster this evidence with expert testimony analyzing the claims and describing the extent to which claimants allege exposures to asbestos-containing insulation materials at the times and places that Armstrong and its wholly-owned subsidiary were installing insulation. The Trust would have to offer the same evidence in support of its estimation of damages.

Indeed, *In re Federal-Mogul Global, Inc.*, 330 B.R. 133 (D. Del. 2005), a decision that Liberty Mutual cites for the proposition that expert estimation of damages is "complex" (Liberty Mut. Mem. at 2), demonstrates that the estimation-related expert testimony is directly relevant to liability issues. Specifically, in estimating the value of existing and future claims in *In re Federal-Mogul*, the experts and the court considered (1) the nature of the asbestos diseases alleged in the pending claims, (2) the history of the company and the claims asserted against it, (3) the company's litigation strategy, (4) historical settlement values, and (5) trends in litigation against asbestos companies. 300 B.R. at 145-49, 159-61.

This type of evidence is equally relevant to whether Liberty Mutual is liable for the non-products asbestos claims under the Policies. Indeed, Liberty Mutual admits as much by conceding that it "does not seek to defer any fact discovery of evidence relating to the nature or quantity of the claims against Armstrong, and [that] the Trust will be free to develop and present

all such evidence that is relevant and admissible to resolve the question whether coverage exists for such claims." (Liberty Mut. Mem. at 2.) If the factual evidence regarding the nature and quantity of claims is relevant and admissible, expert evidence regarding the nature and quantity of claims is equally so.

Liberty Mutual nonetheless argues that the complexity of claims estimation justifies bifurcation. Case law makes clear, however, that complexity alone does not suffice to justify bifurcation. *See, e.g.*, *Rodin Props.-Shore Mall, N.V. v. Cushman & Wakefield of Penn., Inc.*, 49 F. Supp. 2d 709, 721-22 (D.N.J. 1999) (holding that complexity of issues was insufficient to warrant bifurcation where duplication of testimony and evidence would result). Nor will testimony on the estimation issues be so time-consuming or difficult for the parties to present at trial. Liberty Mutual seeks to defer the testimony of only one estimation expert of the Trust, and perhaps one of its own, who will base their opinions on methodologies with which the parties already have considerable experience in the ADR that preceded this litigation. (Liberty Mut. Mem. at 4-5.)

Liberty Mutual further argues that the Trust's expert estimation of the Trust's future liability is irrelevant and improper, but this argument is meritless. Liberty Mutual contends that expert claims estimation is unnecessary because, under *Fuller-Austin Insulation Co. v. Highlands Ins. Co.*, 38 Cal. Rptr. 3d 716, 741-46 (Ct. App. 2d Dist. 2006), an insurer's liability is not determined by an estimation of future liability. Liberty Mutual fails to disclose, however, that this California state appellate court decision is not the lone authority on this issue. The Seventh Circuit in *UNR Industries, Inc. v. Continental Cas. Co.*, 942 F.2d 1101 (7th Cir. 1991), reached the opposite conclusion. In *UNR*, the Seventh Circuit held that where a bankruptcy trust operates "for the exclusive benefit of the asbestos claimants" and where "their claims would 'be fully

settled and satisfied'" by the corpus of the trust, the insurer's obligations are triggered and its liabilities can be determined by an estimation of the magnitude of present and future claims. *Id.* at 1104-05 (citation omitted). That is precisely the Trust's position in this case.

Second, to the extent Liberty Mutual is concerned only with severing the estimation of future liability, such a bifurcation would be highly inefficient and uneconomical because that estimation and the estimation of the non-products percentage involve substantially overlapping evidence – *i.e.*, the dates and locations of the claimants' alleged exposures and relevant employment information of the claimants. Requiring the expert to revisit all of that data in a second phase would be duplicative and unnecessarily costly.

For all of these reasons, bifurcation here would be clearly *un*economical because of the additional time required for discovery. Bifurcation would extend the discovery period far beyond what the parties proposed for the non-bifurcated case. The parties agree that, absent bifurcation, all discovery will be completed in fifteen months. *See* Proposed Unbifurcated Case Schedule (attached as Exhibit A to the Joint Case Report). In contrast, Liberty Mutual's bifurcated case schedule (attached as Exhibit B to the Joint Case Report) provides a thirteen-month period just for discovery regarding liability, plus an unspecified amount of time for discovery regarding damages. Finally, bifurcation would create discovery disputes about whether overlapping evidence is "liability" or "damages" evidence, as well as additional costs for a second trial that would involve duplicative evidence.

In such circumstances, where issues of liability and damages are inextricably intertwined, courts do not hesitate to rule against bifurcation. For example, in *Welcker v. Smithkline Beckman*, 746 F. Supp. 576 (E.D. Pa. 1990), an age and sex discrimination case, the court held that bifurcation was inappropriate because "[m]any of the issues and testimony relate to both

liability and damages" and thus "bifurcation would result in duplicative testimony, rather than a saving of time." *Id.* at 583; *see also, e.g.*, *Doebler's Penn. Hybrids, Inc. v. Doebler*, No. 4:CV-03-1079, 2006 WL 3325607, at *2 (M.D. Pa. Oct. 30, 2006) (denying motion to bifurcate where, *inter alia*, "there is likely to be considerable overlap in testimony as to liability and damages by the key witnesses").[1]

The intertwining of evidence regarding liability and damages in this case distinguishes it from *Koch v. First Niagara Risk Mgmt., Inc.*, Nos. 04-4711, 05-6696, 2006 WL 2794166, at *2 (E.D. Pa. Sept. 27, 2006) (cited in Liberty Mut. Mem at 13.).  While the *Koch* court granted bifurcation, it nevertheless acknowledged the rule that bifurcation should be denied "'when the evidence on the two subjects is overlapping or the liability and damages issues are so intertwined that efficiency will not be achieved or confusion may result from any attempt at separation.'"  *Id.* at *2 (quoting 9 Wright & Miller, *Federal Practice & Procedure: Civil 2d* § 2390 at 502 (1995)).  The court in *Koch* found that "the issue of the defendants' alleged negligence . . . [was] *wholly distinct* from the issue of the individual damages of the twenty plaintiffs," since the damages evidence would have involved the testimony of twenty plaintiffs regarding their individual medical histories and current conditions.  *Id.* (emphasis added); *see also Goldman v. Radioshack Corp.*, No. Civ. A. 03-0032, 2005 WL 1155751, at *1-2 (E.D. Pa. May 13, 2005) (cited in Liberty Mut. Mem. at 13) (granting bifurcation only after finding that "the standards

---

[1] *Accord Rodin Properties-Shore Mall*, 49 F. Supp. 2d at 721-22 (ruling that, even where the issues are "moderately complex" and denying bifurcation will prolong discovery period, such concerns are outweighed by the need to avoid "duplicative testimony and evidence" and the need to encourage settlement); *Vichare v. AMBAC Inc.*, 106 F.3d 457, 466 (2d Cir. 1996) (affirming denial of bifurcation where "issues of liability and damages are intertwined," "[s]everal of the same witnesses would have to be called [twice]," and jury would not be prejudiced by unitary trial).

and evidence required to prove liability and damages were entirely different" and that a decision *not* to bifurcate might prejudice the defendant).

Here, by contrast, the liability issues are not "wholly distinct" from the damages issues. *Cf. Koch*, 2006 WL 2794166, at *2. To the contrary, as shown above, the liability and damages issues "'are so intertwined that efficiency will not be achieved'" if bifurcation is granted. *Id.* (citation omitted).

In sum, bifurcation inevitably will result in increased litigation costs, wasting of judicial resources, and a lengthy postponement of a final decision on Liberty Mutual's obligation to pay the claims of many thousands of asbestos claimants. Accordingly, Liberty Mutual's request for bifurcation should be denied. *See James*, 2005 WL 2989305, at *1 (denying defendant's motion for bifurcation in part because defendant failed to demonstrate that judicial economy would be served).

**B.    Bifurcation Would Prejudice the Trust By Preventing It From Presenting Its Entire Liability Case and By Causing Substantial Delay and Expense.**

Liberty Mutual also has failed to meet its "burden of demonstrating that . . . no party would be prejudiced by separate trials," as required by Fed. R. Civ. P. 42(b). *See James*, 2005 WL 2989305, at *4 (citing *John Middleton, Inc. v. Swisher Int'l Inc.*, No. Civ. A. 03-3908, 2004 WL 792762, *1 (E.D. Pa., April 8, 2004)). In fact, the Trust would be severely prejudiced in numerous ways if the Court should grant bifurcation.

First, the Trust would be prevented from presenting the entirety of its evidence on the liability issue at one time. This, in itself, may adversely impact the Trust's ability to obtain a verdict in its favor on liability.

Second, because the evidence needed to prove liability and damages substantially overlaps, discovery disputes regarding the line that divides liability discovery and damages discovery will abound.

Third, it will certainly require much more time for the Trust to obtain a damage verdict if the trials are separated, and the delay may prevent some witnesses from testifying. Since the period of the claimants' exposure to asbestos extends back more than fifty years and the Policies were issued decades ago, many of the fact witnesses are elderly and may not be alive or well enough to provide testimony in two separate proceedings.

Fourth, unnecessary delay in reaching a conclusion in this case will further delay the Trust's ability to provide the maximum payment possible to those claimants with meritorious claims. The fact that the Trust "has substantial financial resources" does not mean that the Trust and the asbestos claimants will not be prejudiced, as Liberty Mutual argues. (Liberty Mut. Mem. at 2.) There are hundreds of thousands of asbestos claimants. At present, the Trust can afford to pay only 20% of the value of each meritorious claim. *See* Letter from Trust to Prospective Claimant or Claimant Counsel, May 11, 2007, at 3, *available at* http://www.armstrongworld asbestostrust.com/files/AWI%20POC%20Instructions%20v5.pdf ("The current payment percentage is 20%.") (attached hereto as Exhibit 1). If bifurcation is granted, the Trust will have to incur additional litigation costs to present much of the same evidence at two separate trials, potentially reducing further the amount that can be paid to claimants.

**C.**    **Liberty Mutual's Alleged "Substantial and Dispositive Defenses to Coverage" Are Not Relevant to Bifurcation.**

Liberty Mutual's argument that bifurcation should be granted because claims estimation will be unnecessary if Liberty Mutual prevails on its "substantial and dispositive defenses to

coverage" (Liberty Mut. Mem. at 8) is contrary to well-established law that bifurcation may not be based on a defendant's belief in the merits of its own defenses.

In *James v. Interstate Credit & Collection, Inc.*, this Court rejected the very argument that Liberty Mutual now raises. In denying the defendant's request for bifurcation in *James*, this Court expressly stated that, "while a finding against Plaintiff on liability would obviate the necessity for proof of damages, such is the case with every civil case in this courthouse." 2005 WL 2989305, at *2 (citation omitted). Similarly, in *Reading Tube*, the court rejected the defendant insurer's argument that bifurcation of liability and damages was warranted because, *inter alia*, there would be no need to address damages if the policyholder failed to prove liability. 944 F. Supp. at 404 ("Neither can Wausau successfully argue that it should prevail on its motion for separate trials because it believes that Reading Tube will not be able to meet its burden of establishing liability, and it wishes to avoid issues of damages altogether."); *see also Innovative Office Prods., Inc. v. Spaceco Inc.* No. 05-04037, 2006 WL 1340865, at *2 (E.D. Pa. May 15, 2006) ("[T]he validation of this type of self-serving argument, without more, would permit all defendants in all cases to sever liability from damages.") (citation omitted); *McCrae*, 97 F.R.D. at 492 ("A determination on the merits of the defense is neither required nor appropriate at this time [in ruling on a defendant's bifurcation motion]."); *accord Zurich Ins. Co.*, 1998 WL 211749, at *3 (denying insurer's request to bifurcate policyholder's liability claims from bad faith claims based on insurer's "assumption that it will win the coverage issue" because "it assumes the very thing that [the insurer] must prove"); *John Middleton, Inc.*, 2004 WL 792762, at *2 (rejecting defendant's argument that bifurcation would save time and expense of damages discovery and trial if defendant prevailed on liability).

-14-

Nor does *Nyazie v. Kennedy*, No. Civ. A. 97-0120, 1998 WL 472504 (E.D. Pa. July 27, 1998), which Liberty Mutual cites (Liberty Mut. Mem. at 7), support bifurcation.  In *Nyazie,* the court found that "bifurcation offer[ed] substantial benefits regardless of who prevails on liability."  *Id*. at *3 n.4.  The sole liability issue in *Nyazie* was "very narrow" and concerned whether the governmental defendants could be held liable for the death of a teenager who fell in the Potomac River because of the defendants' "alleged failure to provide a brochure [regarding the hazardous rocks overlooking the river] to plaintiffs on the day of the accident."  *Id.* at *2. The court ruled that bifurcation was appropriate because a shorter liability trial would benefit *all* parties – the other Nyazie children were young and many witnesses would not be necessary for the damages issue – and the damages issue was clearly severable from and would involve entirely different evidence than the liability issue.  *Id.* at *3.  Here, by contrast, Liberty Mutual does not (and cannot) claim that all parties or the Court would benefit from bifurcation if the Trust prevails on liability, or that the Trust would benefit in any way from excluding the expert estimation testimony from the liability phase.

In any event, Liberty Mutual will not prevail on its supposedly "substantial and dispositive defenses."  (Liberty Mut. Mem. at 8.)  The Trust has numerous factual and legal arguments that rebut those defenses, including the expert estimation evidence, which is directly relevant to Liberty Mutual's course of conduct in handling Armstrong's asbestos bodily injury claims as well as the claims of other similar policyholders.  Liberty Mutual had an obligation to inquire into the nature of Armstrong's claims to determine whether they should be classified as products or non-products claims.  Had Liberty Mutual complied with that obligation, it would have confirmed that (as the expert testimony will show) most of those claims arose out of

exposure during the installation activities of Armstrong or its wholly-owned subsidiary, and therefore should have been treated as non-products claims.

Thus, Liberty Mutual cannot rely on its defenses as a justification for improperly limiting the Trust's proof of liability and forestalling indefinitely a crucial portion of the Trust's liability case.

###     D.     The Cost of Expert Claims Estimation Does Not Justify Bifurcation.

Finally, Liberty Mutual argues for bifurcation on the grounds that expert claims estimation will be "extraordinarily costly." (Liberty Mut. Mem. at 1.) This argument cannot support bifurcation. Liberty Mutual has spent vast sums of money over the last decade fighting to avoid covering the non-products claims at issue. For Liberty Mutual to complain now that retention of a claims estimation expert would be "extraordinarily costly" is meritless. The cost involved in retaining such an expert pales in comparison to the litigation costs that Liberty Mutual has incurred in an effort to avoid its obligations under the Policies.

Moreover, to the extent Liberty Mutual's argument relies on the fact that the Trust will expend its resources on expert testimony, that argument also is meritless. The Bankruptcy Court found that $3.1 billion is a reasonable approximation of Armstrong's present and future liability for asbestos-related personal injury claims, *In re: Armstrong World Industries, Inc.*, 348 B.R. 111, 136 (D. Del. 2006), and the Trust will show that the bulk of that liability is for non-products claims. The cost to the Trust of obtaining an estimation expert is small relative to the total amount of insurance coverage sought by the Trust to pay the claims of hundreds of thousands of claimants.

IV.    <u>CONCLUSION</u>

Delay has been Liberty Mutual's *modus operandi* for over a decade as it has fought coverage of Armstrong's asbestos-related bodily injury claims. Now that the litigation is on a schedule that will lead to a trial within the next two years, it comes as no surprise that Liberty Mutual would seek to require the Trust to split its case-in-chief and postpone claims estimation to a second phase. For the foregoing reasons, this Court should deny defendant Liberty Mutual Insurance Company's request for bifurcation.

Respectfully submitted,

Dated:  November 21, 2007

*/s/ Stephen A. Madva*
Stephen A. Madva
Mary F. Platt
Steven Pachman
Dave Frankel
MONTGOMERY, MCCRACKEN,
WALKER & RHOADS, LLP
123 South Broad Street
Philadelphia, PA 19109
Tel: (215) 772-1500
Fax: (215) 772-7620

*/s/ Jerome C. Randolph*
Jerome C. Randolph
Mark A. Packman
Alyson A. Foster
GILBERT RANDOLPH LLP
1100 New York Avenue, NW
Suite 700
Washington, DC  20005
Tel:  (202) 772-2200
Fax: (202) 772-3333

# Exhibit 1

**Armstrong World Industries, Inc.**
**Asbestos Personal Injury Settlement Trust**


May 11, 2007


Dear Prospective Claimant or Claimant Counsel,

The Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust ("the Trust") has been established under Chapter 11 of the Bankruptcy Code to resolve all "Asbestos Personal Injury Claims" as defined in the Armstrong World Industries, Inc. Plan of Reorganization ("the Plan") caused by exposure to asbestos-containing products for which Armstrong World Industries, Inc. ("AWI") and its predecessors, successors, and assigns have legal responsibility ("PI Trust Claims"), as provided in and required by the Plan and by the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Agreement ("PI Trust Agreement").  The Trust is organized to provide fair, equitable and substantially similar treatment for all personal injury claims that may presently exist or arise in the future.


**The Trust is commencing its operations and will begin receiving claims on Monday, May 14, 2007 at 10:00 AM EST. The materials necessary to file a claim with the Trust, including Claim Forms, the Trust Distribution Procedures (the "TDP") and associated materials, are included in this package. Copies of Claim Forms as well as these instructions and other relevant documents and reference material also are available on the Trust's website (www.armstrongworldasbestostrust.com), and may be downloaded at any time.**


This instruction letter is intended to summarize certain significant issues related to filing a personal injury claim with the Trust.  *Nothing in this letter is intended to replace or modify the requirements of the Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Distribution Procedures ("TDP").  All claimants are encouraged to read thoroughly and understand the TDP (enclosed) before filing a claim with the Trust.*


**Ordering of Claims:**
Pursuant to Section 5.1(a)(1) of the TDP, prior to the Initial Claims Filing Date (November 14, 2007), claims will be ordered for processing based on the earlier of:

    i.    The date prior to the Petition Date (December 6, 2000) that the specific claim was either filed against AWI in the tort system or was actually submitted to AWI pursuant to an administrative settlement;

    ii.    The date before the Petition Date that a claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with AWI;

    iii.    The date after the Petition Date, but before the date claim filing materials were made available (May 14, 2007), that the asbestos claim was filed against another defendant in the tort system;

    iv.    The date after the Petition Date, but before the Effective Date (October 2, 2006), that a Proof of Claim was filed by the claimant against AWI in AWI's Chapter 11 case;

v.   The date a ballot was submitted on behalf of the claimant in AWI's Chapter 11 case on behalf of the claimant for purposes of voting on the Plan in accordance with the voting procedures adopted by the Bankruptcy Court; or

vi.   The date after the Effective Date, but on or before the Initial Claims Filing Date, that the claim was filed with the PI Trust

Claims will be paid in the order in which they are evaluated and approved for payment.

**Expedited Review (ER) and Individual Review (IR) Claims**
Pursuant to Sections 5.3(a) and 5.3(b) of the TDP, a claimant may elect to submit a claim for either Expedited Review (ER) or Individual Review (IR). The ER process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all categories of PI Trust claims (except those involving Lung Cancer 2 and all Foreign Claims). ER is a method of review intended for claims that can be easily verified by the Trust as meeting the presumptive Medical/Exposure criteria for the relevant disease level. ER will provide qualifying claimants fixed claims payment subject to the Payment Percentage (see Scheduled Values below). Accordingly, ER provides claimants with a less burdensome process for pursuing PI Trust claims than the IR process described below and in Section 5.3(b) of the TDP.

Alternatively, a claimant may elect to have a claim undergo the IR process if the claim does not meet presumptive Medical/Exposure criteria for any of the Disease Levels in TDP Section 5.3 or to determine whether the liquidated claims value exceeds the Scheduled Value. The IR Process provides the claimant with an opportunity for individual consideration and evaluation of the Medical/Exposure information submitted as well as the liquidated value of the claim. The IR process is intended to result in payments equal to the liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any PI Trust claim that undergoes IR may be determined to be less than the claimant would have received under ER. Because the detailed examination and valuation process related to IR requires additional time and effort, claimants electing to undergo the IR process may have a longer waiting period for payment than would have been the case had the claimants elected the ER process.

**Settlement Offers:**
Valid ER claims will be paid the following Scheduled Values, multiplied by the Payment Percentage that is effective at the time of liquidation. Disease Level I claims are not subject to the Payment Percentage.

| Disease Level | Scheduled Disease | Scheduled Value |
|---|---|---|
| VIII | Mesothelioma | $110,000 |
| VII | Lung Cancer 1 | $42,500 |
| VI | Lung Cancer 2 | None |
| V | Other Cancer | $21,500 |
| IV | Severe Asbestosis | $42,500 |
| III | Asbestosis/Pleural Disease Level III | $9,700 |
| II | Asbestosis/Pleural Disease Level II | $3,700 |
| I | Other Asbestos Disease (Cash Discounted Payment) | $400 |

2

*The current payment percentage is 20.0%.* At this payment percentage, a Mesothelioma claim paid at scheduled value will receive $22,000, a Lung Cancer Level I claim will receive $8,500, an Other Cancer claim will receive $4,300, etc. The payment percentage is subject to adjustment by the Trustees under the terms of the TDP. Payment will be made as soon as practicable after receipt and review of the completed Claim Forms and receipt of a fully executed release.

## Proof Required to Qualify for Payment:

To qualify for payment, a claimant must provide credible medical and exposure evidence and a submission deemed to be complete by the Trust.

### Medical Criteria for Qualification

The medical criteria that a claim must meet to receive an offer for the Scheduled Value are as follows:

Level VIII: Mesothelioma

1.  Diagnosis of mesothelioma; and

2.  Credible evidence of AWI Exposure (as defined in Section 5.7(b)(3) of the TDP).

Level VII: Lung Cancer 1

1.  Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease as defined in Footnote 3 of the TDP;

2.  Six months of AWI Exposure prior to December 31, 1982;

3.  Significant Occupational Exposure to asbestos as defined in Section 5.7(b)(2) of the TDP; and

4.  Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

Level VI: Lung Cancer 2

1.  Diagnosis of a primary lung cancer;

2.  AWI Exposure prior to December 31, 1982; and

3.  Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.

Lung Cancer 2 (Level VI) Claims are those that do not meet the more stringent medical an/or exposure requirements of Lung Cancer 1 (Level VII) claims. All claims in this Disease Level shall undergo IR. The estimated likely average of the individual evaluation awards for this category is $15,000, with such awards capped at $50,000 unless the claim qualifies for Extraordinary Claim treatment.

Level VI Claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker. In any event, no presumption of validity shall be available for any claims in this category.

Level V:  Other Cancer

1.  Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease;

2.  Six months AWI Exposure prior to December 31, 1982;

3.  Significant Occupational Exposure to asbestos; and

4.  Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the Other Cancer in question.

Level IV:  Severe Asbestosis

1.  Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65% or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%;

2.  Six months AWI Exposure prior to December 31, 1982;

3.  Significant Occupational Exposure to asbestos; and

4.  Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

Level III:  Asbestosis/Pleural Disease

1.  Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%;

2.  Six months AWI Exposure prior to December 31, 1982;

3.  Significant Occupational Exposure to asbestos; and

4.  Supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question.

Level II:  Asbestosis/Pleural Disease

1.  Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease;

2.  Six months AWI Exposure prior to December 31, 1982; and

3.  Five years cumulative occupational exposure to asbestos.

Level I:  Other Asbestos Disease (Cash Discount Payment)

1.  Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease or an asbestos-related malignancy other than mesothelioma; and

2.  AWI Exposure prior to December 31, 1982.

*Medical Evidence Required to Establish an Asbestos-Related Disease:*
All diagnoses of a Disease Level shall be accompanied by either:

   i.   A statement by the physician providing the diagnosis that at least ten years have elapsed
        between the date of first exposure to asbestos or asbestos-containing products and the
        diagnosis, or

   ii.  A history of the claimant's exposure sufficient to establish a ten-year latency period.

A finding by a physician after the Effective Date (October 2, 2006) that a claimant's disease is
"consistent with" or "compatible with" asbestosis shall not alone be treated by the Trust as a
diagnosis.

*For Disease Levels I-IV* – All diagnoses of nonmalignant asbestos-related disease (Disease Levels
I-IV) shall be based upon a physical examination of the claimant by the physician providing the
diagnosis of the asbestos-related disease

For Disease Levels V-VIII – All diagnoses of asbestos-related malignant disease shall be based
upon either (1) a physical examination of the claimant by the physician providing the diagnosis of
the asbestos-related disease, or (2) a diagnosis of such a malignant Disease Level by a board-
certified pathologist or by a pathologist report prepared at or on behalf of a hospital accredited by
the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a
nonmalignant asbestos-related disease (Levels I-IV) shall be based upon either:

   i.   A physical examination of the claimant by the physician providing the diagnosis of the
        asbestos-related disease, or

   ii.  Pathological evidence of the asbestos-related disease, or

   iii. In the case of Disease Levels I-III, evidence of Bilateral Asbestos-Related Nonmalignant
        Disease and for Disease Level IV, either an ILO reading of 2/1 or greater or pathological
        evidence of asbestosis

   iv.  For either Disease Level III or IV, Pulmonary Function Testing as defined in Footnote 6
        of the TDP.

For a detailed description of the medical evidence requirements by Disease Level see TDP
Section 5.7(a). **You should review this section of the TDP before filing a claim.**

**Exposure Criteria for Qualification**

*Exposure to AWI Asbestos Products and Significant Occupational Exposure*
As set forth in Section 5.3(a)(3) of the TDP, to qualify for any Disease Level, the claimant
must demonstrate exposure to an asbestos-containing product manufactured or distributed by
AWI, and for Disease Levels II, III, IV, V and VII, that exposure must be for at least six
months; and (2) for Disease Levels III, IV, V and VII, a claimant must demonstrate

5

Significant Occupational Exposure ("SOE") to asbestos products as described in Section 5.7(b)(2) of the TDP.

**Site/Plant Where Exposure Occurred**

In Part 3 of the Proof of Claims Form ("POC") questions 1 through 4 ask about the sites where the claimant was exposed to asbestos products. In response to these questions, a claimant must list the sites where he/she was exposed to asbestos products to prove both (1) exposure to AWI asbestos products, and (2) SOE, if applicable.

There are two ways to demonstrate that AWI asbestos products were at a work site:

1.  The claimant worked at a site which is listed on the approved AWI site list, found on the website at www.armstrongworldasbestostrust.com; or

2.  The claimant can establish, through affidavit, invoices, deposition testimony, or other means as described below in the section "Sufficiency of Evidence" that AWI's asbestos products were used at a particular work site. A certification of counsel alone is not sufficient to establish AWI product at a particular site. However, certification of counsel is sufficient to satisfy SOE requirements.

**Significant Occupational Exposure**

As noted above, questions 1 through 4 in Part 3 of the Claim Form seek information regarding SOE, as well as exposure to AWI asbestos products. Additionally, questions 5 and 6 also relate to SOE. Pursuant to TDP Section 5.7(b)(2), SOE means employment for a cumulative period of at least five years with a minimum of two years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

If a claimant worked in an occupation/industry listed on the Presumptive SOE Occupations Rating list, found on the website at www.armstrongworldasbestostrust.com, for at least five years with a minimum of two years prior to December 31, 1982, and if any box other than "None of the above" is checked in Part 3 question 5, no further evidence of SOE is required. If the claimant's occupation/industry is not set forth on the Presumptive SOE Occupations Rating list, or if the box labeled "None of the above" is checked in POC question 5, then evidence of the claimant's SOE must be submitted. Evidence of SOE can be demonstrated by certification of counsel or as set forth below under "Sufficiency of Evidence."

It is only necessary for a claimant to demonstrate SOE to qualify for Disease Levels III, IV, V and VII.

**Exposure to AWI Asbestos Products**

If a claimant has demonstrated in response to question 1 of Part 3 that AWI asbestos products or activities were present at a site/plant where the injured party worked, the claimant must then demonstrate exposure to the type of AWI products or activities at that site/plant. This information must be provided in response to question 7 in Part 3.

Question 7 in Part 3 of the Claim Form can be answered several ways. If the injured party's occupation/industry at that site/plant is on the Presumed Company Exposure List, found on the website at www.armstrongworldasbestostrust.com, simply list that occupation/trade in the response.  Nothing more needs to be provided.

If the occupation/industry at that site is not on the Presumed Company Exposure List, a description must be provided of the injured party's exposure to the type of AWI asbestos products or activities at that site.

If this description is already set forth in documents submitted in response to question 1 in Part 3 of the Claim Form (e.g., claimant affidavit, interrogatory answers, etc.), respond to question 7 by simply referencing the documents.

### Sufficiency of Evidence
Where a claimant must demonstrate that AWI asbestos products were at a site/plant, or where a claimant seeks to demonstrate SOE, such evidence may be established by:

- An affidavit of the injured party (an example is included in the filing instruction)
- An affidavit of a co-worker or the affidavit of a family member in the case of a deceased claimant
- Invoices
- Construction or similar records
- Sworn statement, interrogatory answers, work history, or deposition
- Other reliable evidence

**Releases:**
A claimant accepting an offer must execute a full release for all malignancy payments, or a limited release for nonmalignancy payments.  Any claimant who receives a payment for a nonmalignant injury may file a new *personal injury claim* for an asbestos-related malignancy that is *subsequently* diagnosed.  Any additional payments to which such claimant may be entitled shall not be reduced by the amount of the prior payment for a nonmalignant disease.

**How to Initiate a Claim:**
If a claimant is qualified and elects to file a claim, he or she must file a complete Claim Form and submit all supporting documentation indicated.

A sample of the Claim Form is enclosed and may be copied to provide forms for all claimants represented by a law firm.  A claimant must submit the appropriate, fully completed Claim Form, including all supporting information referenced in the form.  To expedite processing, claimants are encouraged to file electronically by following the instructions at the Trust website (www.armstrongworldasbestostrust.com).

Claims can be filed electronically using the Trust Online system.  To do so, download and complete the E-Filer Agreement (EFA) from the Trust website (www.armstrongworldasbestostrust.com).  Once that agreement is executed, a Trust Online user ID and password will be provided to login to the system.  Trust Online supports the ability to enter new claims, edit existing claims, cure deficiencies on existing claims, upload and view supporting documents and run a variety of reports on filed claims. These features are designed to simplify and expedite the claim filing process while saving time and money for all parties.  Claimants and counsel are encouraged to use these online filing features.

Claims can be filed in bulk using the Trust Online Bulk Upload Tool or using web services.  These tools support the submission of multiple claims quickly and efficiently.  For law firms that have

claimant data already in electronic form, either tool can be used to send that data to the Trust without having to retype it into Trust Online or submit paper claims. These tools also support the submission of supporting document images along with the claim records. Contact the Trust for detailed instructions on how to use the Bulk Upload Tool or web services at (866) 665-5790.

Finally, using Trust Online it is possible that claim data previously submitted to the Celotex Trust, the B&W Trust or the USG Trust can be used to expedite the preparation and review of claims for the AWI Trust. By using claim data already available in the Celotex Trust, B&W Trust or USG Trust systems, the Trust may expedite the approval of AWI claims. In no situation will using existing data negatively impact a review, nor will this information be used without the express approval of the claimant.

**Where to Submit Claim Forms:**
Electronic claim submissions, including document images, can be filed directly through the Trust Online system. There is no need to submit paper claims for Trust Online submissions.

However, if paper claims and documents need to be sent to the Trust, they should be addressed to:

>       Armstrong World Industries, Inc. Asbestos Settlement Trust
>       P.O. Box 1079
>       Wilmington, Delaware 19899-1079

**Statutes of limitation on filing a claim:**
To be eligible for processing, a claim must meet either:

   i.   For claims first filed in the tort system against AWI prior to the Petition Date (December 6, 2000), the applicable federal, state, and foreign statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or

   ii.  For claims not filed against AWI in the tort system prior to the Petition Date, the applicable federal, state or foreign statute of limitation that was in effect at the time of the filing with the Trust. However, the running of the relevant statute of limitation may be tolled by a number of factors (see TDP Section 5.1(a)(2).

**Doctors and Medical Facilities:**
Section 5.7(a)(2) of the TDP requires that before making any payment the Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Trust has determined, based on currently available information, that medical reports from certain doctors and medical facilities may not meet the reliability standards of this section. *Accordingly, until further notice, the Trust will not accept medical reports from and will not process claims relying upon medical information from the following doctors and medical facilities: Dr. James Ballard, Dr. Kevin Cooper (of Pascagoula, Mississippi), Dr. Todd Coulter, Dr. Andrew Harron, Dr. Ray Harron, Dr. Glynn Hilbun, Dr. Barry Levy, Dr. George Martindale, Dr. W. Allen Oaks, Netherland & Mason, Inc., Respiratory Testing Services, Inc. and Occupational Diagnostics.*

**Questions and Assistance:**
If you have questions concerning these filing procedures or forms, you may reach the Trust in a variety of ways. The Trust has established a Help Line and website to report on the status of Trust operations and respond to questions. You can reach the Help Line at (800) 708-8925 or at helpline@armstrongworldasbestostrust.com. The Trust's website address is www.armstrongworldasbestostrust.com. The Trust also offers convenient web-based training for all

Trust Online users. The detailed user manual explains how to log onto Trust Online, submit a new AWI claim, convert an existing Celotex Trust, B&W Trust or USG Trust claim to an AWI claim, how to link claims, and submit documents. To access these training tools, go to www.armstrongworldasbestostrust.com and click on the Resources link. Simply download the desired information and view them at your convenience.

In addition to these resources, the Facility offers in-person training sessions at our Wilmington claims processing facility. If you or your staff is interested in attending a training session, please contact our Web Administrator at (866) 665-5790 or websupport@armstrongworldasbestostrust.com.

Sincerely,

The Armstrong World Industries, Inc. Asbestos Personal Injury Settlement Trust Trustees

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Memorandum of Plaintiff Armstrong World

Industries, Inc. Asbestos Personal Injury Settlement Trust in Opposition to Request of Defendant

Liberty Mutual Insurance Company for Bifurcation was mailed today by U.S. first-class mail,

postage prepaid, to:


A. Hugh Scott, Esquire
Kathleen Cloherty Henry, Esquire
Kathleen Burdette Shields, Esquire
Choate, Hall & Stewart
Two International Place
Boston, MA  02110

John C. Sullivan, Esquire
Four Penn Center
1600 John F. Kennedy Blvd.
Philadelphia, PA  19103

*Attorneys for Defendant*


This document has been filed electronically and is available for viewing and downloading
from the ECF system.


Dated:  November 21, 2007          */s/ Stephen A. Madva*_____
                                   Stephen A. Madva